UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

REGINA KILGORE )
 )
V. ) NO. 2:16-CV-67
 )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security )

# **MEMORANDUM AND ORDER**

This matter is before the United States Magistrate Judge, with the consent of the parties and an order of reference pursuant to 28 U.S.C. § 636 for final disposition. Plaintiff's application for Disability Insurance Benefits under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 15], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 17].

## I.     Standard of Review

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

## II. Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant

numbers of other jobs exist in the national economy which
the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

### III. Plaintiff's Vocational Characteristics

The Vocational Expert ["VE"] who testified at plaintiff's administrative hearing defined plaintiff's past relevant work as she performed it as an "Account Executive." Although the Dictionary of Occupational Titles ["DOT"] states that job, 164.167-010, as sedentary, the VE stated that plaintiff performed it at a light level of exertion [Tr. 77]. That job required no skills transferable to other work. She had a high school education, and was an "individual closely approaching advanced age" on her alleged disability onset date of October 22, 2013 and at the time the ALJ rendered his hearing decision on June 2, 2015. The ALJ found that the plaintiff could perform her past relevant work at Step 4 of the sequential evaluation process. Even if the process had gone to Step 5, and if she had been capable of the full range of light work, Rule 202.14 of the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 [the "Grid"] would have directed a finding that she was not disabled. However, four months after the ALJ's hearing decision the plaintiff reached the age of 55 and became a person of "advanced age." At that point, with the same vocational characteristics, she would be disabled under Grid Rule 202.06.

### IV. Evidence in the Record

Plaintiff's medical history is detailed in her brief as follows:

> The Plaintiff has suffered from back pain for a number of years. She has been cared for this back pain by Holston Medical Group, and as early as January

2008, it was noted that she was suffering from severe low back pain which was made worse with driving (TR 808). At that time, it was opined by Dr. Andrew P. Brockmyre that the Plaintiff could not sit for more than 30 minutes or stand continuously for more than 30 minutes, must limit her driving, and limit her working hours away from home to less than 25 hours per week (TR 809-810). In February 2008, it was noted that she was doing ok during the day with the TENS unit (TR 802). In April 2008, it was noted that she still had pain in her right groin worse with prolonged sitting and also pain in her left hip which was worse if sitting for more than just a few minutes (TR 789).

The Plaintiff was referred to Highlands Neurosurgery and on August 13, 2008, they diagnosed lumbar pain, right lower extremity discomfort with recent EMG studies showing a chronic 81 radiculopathy, degenerative changes of the lumbar spine seen on an MRI study from February 2007 with a paracentral and left L4-L5 disc protrusion and annular tear at the L5-S1 region, and anxiety, GERO, and tobacco abuse (TR 769). The Plaintiff underwent an MRI (TR 767-768) and Dr. J. Travis Burt reported that the MRI revealed disc extrusions and disc protrusions of the L4-L5 and L5-S1 that resulted in some impression upon the exiting LS and 81 nerve roots (TR 765). The Plaintiff underwent a right L4-L5 and L5-S1 laminectomy diskectomy on September 15, 2008 and on October 24, 2008, Dr. Burt noted that there was an improvement in her right lower extremity radicular discomfort but she still had lumbar pain consistent with her surgery (TR 753). On December 12, 2008, Dr. Burt noted that the Plaintiff was status post right L4-5, L5-S1 laminectomy and diskectomy and that she had some residual right leg pain which he felt might be due to chronic or at least some nerve root injury. Her gait was slightly guarded and he advised the Plaintiff to continue with her walking and stretching exercise program (TR 745).

The Plaintiff continued under the care of the Holston Medical Group. In May 2009, she was diagnosed as suffering from hypothyroidism and fatigue (TR 709). On July 1, 2009, she was suffering from lumbar disc degenerative and cervicalgia (TR 696). On July 30, 2009, she had an MRI of the thoracic spine which showed what appeared to be a prominent disc protrusion or extrusion at T8-9 (TR 683). An MRI of the cervical spine showed broad base central disc bulging at CS-6 and C6-7 (TR 678).

The Plaintiff underwent a CT scan of the lumbar spine on September 25, 2009. This showed a normal L3-4 intervertebral disc but a probable grade 4 posterior annular tear at L4-5 with superimposed posterior disc protrusion, resulting in moderate to severe spinal canal stenosis (TR 663). There was no significant neural foraminal narrowing (TR 663-664) but the Plaintiff had L5-S1 spondylosis without significant spinal canal stenosis or neural impingement and it did not appear to be worsened since the July 2009 examination (TR 664). Dr. Morgan P. Lorio noted that the Plaintiff had a history notable for depression and a diskogram was performed (TR 665). A large herniated disc was noted at L4-L5 (TR 666).

On July 19, 2011, Dr. Burt diagnosed the Plaintiff as suffering from diffuse pain without a significant radicular component involving the upper extremities. She had a chronic complaint of right leg pain that was likely due to a

nerve root injury along the LS distribution. She also had a history of right L4-5 as well as L5-S1 laminectomy and discectomy, fibromyalgia, diffuse pain, and tobacco abuse. He did not feel she had a surgical legion (TR 554) and referred her to pain management (TR 555).

The Plaintiff came under the care of Dr. Dennis Aguirre. He diagnosed the Plaintiff as suffering from osteoarthrosis and allied disorders, multiple sites, and degeneration of her cervical intervertebral disc. He also thought that she had hypertrophic osteoarthritis, degenerative disc disease of the cervical spine, posterior element syndrome, bilateral costochondritis, status post L4-5, L5-S1 laminectomy/discectomy, right S1 radiculopathy, breast augmentation, but she did not fit the criteria for fibromyalgia, chronic obstructive pulmonary disease, psychosocial dysfunction, depression, and hypothyroidism (TR 533).

The Plaintiff continued under the care of Holston Medical Group. In January 2012, the Plaintiff was diagnosed as suffering from allergic rhinitis, lumbar disk degeneration, nausea and abdominal pain (TR 517). The Plaintiff underwent gall bladder surgery (TR 483). In February 2012, Dr. Brookmyre hospitalized the Plaintiff because of confusion (TR 464). He diagnosed hypoxia, altered mental status, fever, headache and a recent fall (TR 465). In April 2012, the Plaintiff was diagnosed as suffering from shortness of breath, fatigue, nicotine dependence and obstructive sleep apnea (TR 427). In June 2012, it was noted that she had osteoporosis of the spine and osteopenia of the hips (TR 411).

The Plaintiff came under the care of Dr. Roger J. McSharry for shortness of breath. He noted that spirometry showed moderate air flow limitation (TR 400). He diagnosed moderate chronic obstructive pulmonary lung disease, on good treatment, reported sleep apnea, and chronic pain (TR 401).

In December 2012, Holston Medical Group noted the Plaintiff had allergic rhinitis and lumbar disc degeneration (TR 375). In May 2015, it was noted that she was suffering from intrinsic asthma (TR 349). It was noted that she had 82 active problems (TR 346-348).

The Plaintiff was also under the care of Ms. Lisa P. Sherfey , LCSW, a social worker. On April 2, 2010, she noted the Plaintiff was anxious, depressed, sad, and worried but she had no hallucinations or psychosis. She also had interrupted sleep (TR 343). She diagnosed the Plaintiff as suffering from adjustment disorder, rule out major depression and noted that she had thyroid problems, chronic pain, and a history of back surgery. She also had grief, job stress and health issues and her GAF was 50 (TR 344). On April 16, 2010, Ms. Sherfey noted that the Plaintiff remained anxious and depressed and tearful. She was very stressed about her job and Ms. Sherfey opined that the Plaintiff's prognosis was guarded. At that time she diagnosed the Plaintiff as suffering from major depression, moderate to severe, chronic back and neck pain and opined that her GAF was 45 (TR 339). On May 14, 2010, she thought that the Plaintiff's prognosis was good but she again diagnosed major depression as well as generalized anxiety disorder and opined that her GAF was 55 (TR 338). Ms. Sherfey continued to follow the Plaintiff and continued to diagnosed the Plaintiff as suffering from major depression (TR 304-337). In April 2011, she had increased depression and anxiety and thought that she was being targeted at her

work (TR 327). In May 2013, it was noted that the Plaintiff was no longer working and that her pain was severe (TR 306).

The Plaintiff was evaluated on behalf of the Defendant by Dr. Chad R. Sims, Ph.D., on August 5, 2013. He noted that her current psychiatric state was depressed and he felt that she had evidence of a mild impairment in her social relating in the context to her depressive symptoms but no evidence of impairment in her ability to adapt to change. She appeared able to follow instructions, both written and spoken and she had mild impairment in her short term memory and in her ability to sustain concentration. She showed evidence of mild impairment in her long-term and remote memory functioning. He diagnosed depressive disorder, NOS, remote history of cocaine abuse/dependence, hypothyroidism, COPD, asthma, osteoporosis of the spine, fibromyalgia, and degenerative disc disease and he opined that her current GAF was 58-60 (TR 816).

The Plaintiff was evaluated on behalf of the Defendant by Dr. Jonathan Wireman on September 5, 2013. He noted that her gait was antalgic and tandem walking was mildly unstable. She resisted motion poorly in the upper extremities and had 4/4 strength throughout including grips. He diagnosed COPD with a long smoking history, low back pain with radicular description, with reported sensory changes in the right ankle and foot, fibromyalgia, hypothyroidism, light patellar tendon mass and neck pain. He opined that she could likely stand or walk for four hours out of an eight hour shift with frequent breaks and sit for eight hours out of an eight hour shift with reasonable breaks and frequent position changes. She could likely lift five pounds frequently and 20 pounds occasionally (TR 820).

The Plaintiff underwent spigelian hernia repair on October 22, 2013. It was noted that hernia was causing some pain (TR 843). She developed aspiration pneumonia as a result (TR 839).

The Plaintiff was treated by Holston Medical Group in November 2013, for swelling of her right knee. She was diagnosed as suffering from pre-patellar bursitis of the right knee (TR 930). On November 22, 2013, it was noted that she had a fall and also had numbness in her left hand (TR 920). In regards to her back pain, her medicine was changed from Lidoderm 5% external patch to Lidocaine 5% external patch (TR 926). In June 2014, the Plaintiff was taking Xanax for anxiety and morphine for pain (TR 969).

The Plaintiff came under the care of Dr. Ronald Hamdy in January 2015. He diagnosed post-menopausal osteoporosis (TR 970).

The Plaintiff underwent an MRI of the lumbar spine on November 29, 2014. Itwas noted that there had been partial laminectomies on the right at L4-L5 and L5-S1 and the L4-L5 level showed a small central disc herniation of the protrusion type with associated annular tear with only very mild ventral thecal sac deformity. There was no central canal stenosis (TR 1009). An MRI of the thoracic spine noted that the prior right sided T8-T9 disc protrusion was smaller but there was a very small disc protrusion with minimal ventral cord deformity at T5-T6 (TR 1010). An MRI of the cervical spine showed a further Joss of disc space height at C5-C6 and there were very mild disc bulges without mass effect at C4-C5, C5-C6 and C6-C7. The spinal cord and foramen magnum areas were normal. There was some uncovertebral joint hypertrophy bilaterally causing

foraminal encroachment at C5-C6 which was probably mild although it was slightly greater on the right. This showed further degenerative loss of disc space height at C5-C6, mild bulges at C4-C7 without central stenosis and possible spondylosis bilaterally at C5-C6 mild on the left and mild to moderate on the right (TR 1011). An MRI of the hips were within normal limits (TR 1012).

  The Plaintiff came under the care of Dr. David M. Pryputiniewicz at the Blue Ridge Neuroscience Center on April 21, 2015. He noted that the Plaintiff appeared to be in mild distress due to pain and examination of the hip and neck revealed diffuse tenderness over the cervical region with diffuse tenderness over the thoracic and lumbar region along with the right SI region and the piriformis musculature on the right. There was no limitation of motion in the upper extremities but that testing was limited due to pain.

  There was hypesthesia in the right distal peroneal nerve distribution (TR 1027). Dr. Pryputiniewicz diagnosed lumbar degenerative disc disease, low back pain and thoracic pain. Dr. Pryputiniewicz did not feel that any surgical intervention would help and he felt there was no radiographic abnormality warranting placement of activity restrictions (TR 1028).

  The Plaintiff continued to be seen by Holston Medical Group. It was noted that she had a lymph node in her neck (TR 1033). She was noted to have numerous active problems including abdominal pain (TR 1033) anemia, anxiety, bronchitis, back pain, chronic pain, FOPD, Edema, Fatigue, Fibromyalgia, (TR 1034) and in fact she had 113 active problems (TR 1033-1036). She had tenderness of her left trapezius muscle and right trapezius muscle and bilateral muscle spasm in her cervical spine and lumbar spine. Flexion was painful as was extension and she was diagnosed as suffering from Jymphadenopathy, knee pain, back pain, and chronic continuous use of opioids (TR 1039). On April 29, 2015, it was noted that she had COPD was doing poorly on control and anxiety disorder (TR 1058). On May 29, 2015, it was noted that she had 58 active problems (TR 1051-1052).

[Doc. 16, pgs. 2-9].

On April 27, 2015, the ALJ held the plaintiff's administrative hearing. After the plaintiff testified, the ALJ took the testimony of the VE, Ms. Donna Bardsley. After she identified the plaintiff's past relevant work, she was asked to assume a person with the plaintiff's vocational characteristics who could do light work with occasional posturals; no ropes, ladders, scaffolds; avoid concentrated exposure to hazards and fumes and other irritants. When asked if there would be jobs, the VE stated that this person could perform the plaintiff's past relevant work. She also identified various other jobs in the state and

7

national economies which such a person could perform (Tr. 77-78).  There is no dispute that these would constitute a significant number of jobs under the applicable regulations.

V.     **ALJ's Findings**

On June 4, 2015, the ALJ issued his decision on the plaintiff's claim.  He made the following findings:

1.     He found that the plaintiff was not working, and had not worked since October 22, 2013, her alleged onset date (Tr. 50).

2.     He found that she has severe physical impairments of fibromyalgia; degeneration of the cervical, thoracic, and lumbar spine; osteoporosis of the lumbar spine; status-post lumbar surgery; myalgias; and asthma.  With respect to the plaintiff's claimed mental impairments, he noted that she was prescribed medication for this by her primary care doctors, and that she was described by their records "as oriented with intact insight and judgment."  (Tr. 50).  He then discussed the findings of the consultative examiner, Dr. Chad R. Sims, the clinical psychologist whose findings are set forth hereinabove.  Based upon Dr. Sims finding no more than mild difficulties with memory and concentration, the ALJ found that plaintiff's "medically determinable mental impairments of Anxiety Disorder NOS, Depressive Disorder NOS, and Remote History of Cocaine Abuse/Dependence, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."  (Tr. 51).

The ALJ then described the four functional areas set out in the mental health listing of impairments found at 20 CFR, Part 404, Subpart P, Appendix 1, the "paragraph

B criteria." (Tr. 51). In the first area, activities of daily living, he found she had a mild limitation. In that regard he noted she had told Dr. Sims she neglected self-care, had limited engagement in chores, and loss of interest in activities aside from spending time with her dogs. She reported crying spells on a weekly basis. On bad days she did nothing but sedentary activities, and on good days did mostly cooking, cleaning and talking to her friend on the phone (Tr. 51). In the second area of functioning, social functioning, he found a mild limitation. He pointed to coherent responses, appropriate behavior at medical appointments, and no history of personal problems with co-workers or supervisors (Tr. 51). With respect to the third area involving concentration, persistence or pace, he also found a mild limitation, based upon Dr. Sims' finding to that effect during his exam (Tr. 51). Finally, in the fourth area, he found no episodes of decompensation had occurred (Tr. 52). Therefore, relying upon 20 CFR §404.1521a(d)(1), he found that none of her mental impairments were severe. That regulation provides that if a claimant's degree of limitation is no more than mild in any of first three areas of function described above, "we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities…." *Id*.

The ALJ continued his discussion of the plaintiff's asserted mental impairments by further explaining the bases for his opinion. He stated that "[o]ther than prescription medication from her primary care source, the record reflects no actual professional mental health treatment for anxiety and depression." (Tr. 52). He noted that "[n]o treating source has indicated that the claimant has significant emotional problems." *Id*.

9

He noted she had not required psychiatric hospitalization, and that while that she "may be depressed and anxious, the evidence shows that she is able to think, communicate, and act in her own interest." *Id*. He pointed out that Dr. Sims' personally observed the plaintiff and that his findings of no more than mild impairments were "assigned great evidentiary weight." *Id*. He then stated that the State Agency psychologists who examined plaintiff's records, including the report of Dr. Sims, and concluded that the plaintiff had moderate difficulties regarding activities of daily living and concentration, were "an overestimate of the claimant's mental limitations as they are clearly not supported by credible evidence," and were given little evidentiary weight. *Id*.

3.  The ALJ found that the plaintiff had no impairment(s) which met or equaled the effects of any impairment in the listing of impairments (Tr. 53).

4.  He found that the plaintiff had the residual functional capacity ["RFC"] "to perform light work…except that she is able to occasionally perform postural activities not requiring climbing ladders, ropes, or scaffolds or concentrated exposure to hazards and other respiratory irritants." (Tr. 52). He reiterated that plaintiff had no non-exertional impairments, such as a mental impairment. He then stated that the plaintiff's description of the effects of her symptoms on her abilities to perform work activities were not entirely credible. He then discussed her physical medical history at great length (Tr. 53-55). In this regard, he found she did not have any impairment the effects of which would prevent her from performing activities within the context of the RFC finding (Tr. 55). He further explained his reasons, including radiographic studies, physical exams showing normal ranges of motion, and conservative treatment (Tr. 56). He stated the State

Agency physicians supported this finding. He found that Dr. Wireman's restriction on stand/walking to up to four hours was entitled to little evidentiary weight because it was "an overestimate of the severity of the claimant's limitation based on his own objective findings and the one time evaluation of the claimant" to which he gave little weight (Tr. 56-57).

5. He then found the plaintiff could return to her past relevant work based upon Ms. Bardsley's testimony. Alternatively, he found the plaintiff could perform the jobs identified by Ms. Bardsley at the light level of exertion. Accordingly, he found that the plaintiff was not disabled (Tr. 57-58).

## VI. Plaintiff's Assertions of Error and Analysis

Plaintiff first states that the ALJ erred in finding that the plaintiff could return to her past relevant work with respect to both her alleged mental and physical impairments. Her second assignment of error is that the ALJ improperly found that the plaintiff was not entirely credible.

With respect to the ALJ's finding that she did not have a severe mental impairment, plaintiff points to the fact that both State Agency psychologists who examined the plaintiff's medical records opined that she had severe impairments with respect to both her anxiety disorder and her affective disorder (Tr. 85 and 104). Both also found that plaintiff had moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 86 and 109-110). Likewise, both psychologists relied upon the lengthy treatment history by LCSW Lisa P. Sherfey (Tr. 83 and 102). More importantly, both opined that Dr. Sims' mental assessment in August 2013 was "felt not restrictive enough for totality of evidence and

11

given little weight…" (Tr. 86 and 105). As stated above, the ALJ discounted their opinions because they "are clearly not supported by credible evidence." (Tr. 52).

The bar for a plaintiff to cross in proving that he or she has a severe impairment is quite low. The Sixth Circuit, from time immemorial, has held that "the step two severity regulation...has been construed as a *de minimis* hurdle in the disability determination process...Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience. *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted). The *de minimis* standard exists to allow "the threshold dismissal of claims obviously lacking medical merit." *Id*. "The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out 'totally groundless claims.'" *Griffeth v. Commissioner of Social Security*, 217 F. App'x 425, 428 (6th Cir. 2007)(quoting *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985)). Having a severe impairment and being disabled are quite different concepts. Thus statements that a claimant's conservative treatment or daily activities do not suggest that the claimant could engage in at least some work activity which are of vital importance in determining the RFC have very little meaning in a Step Two analysis of whether an impairment is severe or non-severe.

In the present case, the ALJ has found that the plaintiff has not shown a severe mental impairment, primarily because "[o]ther than prescription medication from her primary care source, the record reflects no actual professional mental health treatment for anxiety/depression…," and "no treating source has indicated that the claimant has significant emotional problems." (Tr. 52). The fact that a treating medical doctor of

12

whatever specialty is prescribing medication for depression and anxiety would seem to the Court to be both "professional treatment," as well as an indication that the prescribing doctor feels that the plaintiff has emotional problems sufficiently significant to merit prescribing the medication. Also, the ALJ, and the Commissioner, are completely silent with respect to the treatment given to the plaintiff by Lisa Sherfey, the LCSW with whom the plaintiff had 36 visits between April 2010 and May 2013 (Tr. 303-344).

Ms. Sherfey is a Licensed Clinical Social Worker ["LCSW"]. As such, she is not an "acceptable medical source" under 20 CFR § 404.1513(a). That distinction is limited to physicians, licensed or certified psychologists, optometrists (with respect to measurement of visual acuity and visual fields only), podiatrists (in certain states), and speech pathologists (for establishing speech impediments only). However, paragraph (d) of this regulation provides that "other sources" may be used, including "medical sources not listed in paragraph (a)." In Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, the Commissioner set forth policies regarding the consideration of the "other sources" referenced in the CFR section above. The SSR, in describing "other sources," included "licensed clinical social workers" in its definition of "medical sources who are not 'acceptable medical sources.'" *Id*. at *2. The ruling then stated:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as …*licensed clinical social workers*, have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed "acceptable medical sources," under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

*Id*. at *3 (emphasis added).

The SSR went on to discuss the "explanation of consideration given to opinions

13

from 'other sources.'" "Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources'…who have seen the claimant in their professional capacity." *Id.* at *6. It went on to say that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an impact on the outcome of the case." *Id.*

After the implementation of this SSR, the Sixth Circuit decided the case of *Cruse v. Commissioner of Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007). In that case, the ALJ actually discussed the findings of plaintiff's nurse practitioner, and discounted them saying that the nurse was not a doctor. The Court stated that "following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of [the nurse practitioner's] assessment." *Id.* at 541.

Likewise, in *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), the Sixth Circuit remanded the case, in part, because "the ALJ fail[ed] to mention Ms. Dailey, Cole's treating counselor, in the analysis of Cole's diagnosis and RFC and [gave] no reasons for not crediting her opinions." *Id.* at 939. The Court went on to say that the counselor "is an 'other source,'… who is entitled to consideration due to her expertise and long-term relationship with Cole." *Id.*

In this case, based on *Cruse* and *Cole, supra*, and the language of SSR 06-03p, the Court finds that the ALJ erred by not at least discussing the treatment notes from Ms. Sherfy. In fact, the Court is of the opinion that the hearing decision should have stated a

14

basis for rejecting her opinion that the plaintiff suffers from major depression that was causing a lack of sleep, loss of energy and paranoia. However, even if an explanation for giving them little weight was not required, as some cases from other districts such as *Southward v. Commissioner of Soc. Sec.*, 2012 WL 3887439 (E.D. Mich. 2012), have suggested, it is indisputable that the SSR and the Sixth Circuit cases discussed above require consideration of her treatment of the plaintiff. In the present case, with absolutely no mention of that treatment, the Court has no assurance that Ms. Sherfy's records were even considered. Also, as stated above, her records are especially vital to the issue of whether plaintiff has met the *de minimis* hurdle of showing a severe mental impairment. The State Agency psychologists, in no small part, based their opinion that she had moderate mental impairments in two of the four critical areas of functioning on the observations of Ms. Sherfy, causing them to both concluded that Dr. Sims' opinion of only mild difficulties was *not restrictive enough*, and that the plaintiff does in fact have a severe mental impairment.

Of course, the argument could be made that the ALJ rejected Ms. Sherfy vicariously by finding that the State Agency psychologists were "clearly not supported by credible evidence." An explanation of why her treatment notes, along with the fact her treating doctor prescribed medication for her depression, do not constitute "credible evidence" is necessary. In this case, this complete omission of the fact that Ms. Sherfy's treatment of plaintiff even existed prevents the Commissioner's finding in this regard from being substantially justified.

Given that the case must be remanded for clearer evaluation of these issues, the Court will defer discussion of the plaintiff's physical condition and her credibility. The

15

plaintiff's Motion for Judgment on the Pleadings [Doc. 15] is GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 17] is respectfully DENIED.

SO ORDERED:

s/ Clifton L. Corker
United States Magistrate Judge